## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### Martinsburg Division

**CURT RICE,**

      **Plaintiff,**

**v.**                                                          **Civil Action No. 3:14-CV-93 (Groh)**

**GREEN TREE SERVICING, LLC,**

      **Defendant.**

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Curt Rice, by and through counsel Andrew C. Skinner and Skinner Law Firm, respectfully requests that this Court grant summary judgment in his favor and in support thereof states as follows:

### INTRODUCTION

Plaintiff has been paying premiums for private mortgage insurance after the automatic termination date that should have come into effect in 2014 following his loan modification in 2010.  Mr. Rice had attempted to have Defendant Green Tree Servicing, LLC ("Green Tree") to cease collecting these premiums, pointing out that the Homeowner's Protection Act sets an automatic termination date after which it is illegal to collect such premiums.  But Green Tree refused to cease its collection efforts.  Therefore, Plaintiff filed suit.

The essence of this case is simple.  Both parties agree that the question for the Court to determine is what the denominator of a fraction should be.  Plaintiff asserts that

the statutory language contained in the Homeowner's Protection Act of 1998, 12 U.S.C. § 4901 *et seq*. ("HPA"), requires that the denominator of the fraction used to determine the termination date for private mortgage insurance ("PMI") is "the original value" of the property.  Defendant argues that instead of relying on the wording of the statute itself, the loan mortgage servicing guidelines of the quasi-governmental organization, Federal National Mortgage Association ("Fannie Mae"), should trump the express language of the HPA; by using Fannie Mae's guidelines, the denominator would be the value of the property around the time of a loan modification.

The Plaintiff's position is correct.  The HPA statute itself directs the use of the "original value" as the denominator.[1]  The Defendant's position is incorrect not only because the statute directs using the original value, but also because the HPA has a specific provision that the servicing guidelines of Fannie Mae are superseded by the HPA.[2]   Moreover, Defendant's position is also incorrect because the part of the HPA that Defendant relies upon to avoid using "original value" as the denominator provides that, in cases of loan modifications, the "terms and conditions" of the loan modification

---

[1] "[…] (B)  with respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the *original value* of the property securing the loan."  12 U.S.C. § 4901(18).  (Emphasis added).

[2] "(b)  Effect on other agreements. The provisions of this Act *shall supersede* any conflicting provision contained in any agreement relating to the servicing of a residential mortgage loan entered into by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any private investor or note holder (or any successors thereto)."  12 U.S.C. § 4908.  (Emphasis added).

must be considered when establishing termination dates.[3]  However, there are no terms or conditions of the loan modification agreement in this case that speak to the value of Plaintiff's home at the time of the loan modification.  Stipulated Facts, ¶ 9, Ex. A-2.

The Court needs to merely follow the express terms of the statute to grant summary judgment to Plaintiff.  Under Defendant's theory, the Court would be required to ignore the plain language of the part of the statute that says original value is the denominator, ignore the plain language of the part of the statute that says Fannie Mae servicing guidelines are superseded, and then also contort the meaning of the provision in the statute that says the terms and conditions of the loan modification agreement must be considered.

Obviously, "[t]he general rule is that unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language (the Plain Meaning Rule)." *Phillips Construction, LLC v. Daniels Law Firm, PLLC,* 2015 U.S. Dist. LEXIS 34033, 7 (S.D. W. Va. March 19, 2015) (*citing Hillman v. I.R.S.*, 263 F.3d 338, 342 (4th Cir. 2001) (citing *Caminetti v. United States*, 242 U.S. 470, 485, 37 S. Ct. 192, 61 L. Ed. 442 (1917)); *see also United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988) (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 453, 107 S. Ct. 1207, 94 L. Ed. 2d 434 (1987) (Scalia, J., concurring)) ("[W]hen the terms of a statute are clear, its language is conclusive and courts are 'not free to replace . . . [that clear language] with

---

[3] "(d)  Treatment of loan modifications. If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect *the modified terms and conditions* of such loan." 12 U.S.C. § 4902.  (Emphasis added).

an unenacted legislative intent.'"). "Additionally, the Court must give meaning to every word of the statute, not reading any word out or treating it as surplusage." *Campbell v. Hampton Rds. Bankshares, Inc*., 925 F. Supp. 2d 800, 809 (E.D. Va. 2013) (citing *United States v. Pressley*, 359 F.3d 347, 350 (4th Cir. 2004)).

The Plain Meaning Rule means that the Plaintiff's arguments must prevail.  As a result, Defendant has been unlawfully collecting PMI premiums from Plaintiff for over a year after it was required to stop.  Only if the plain meaning of the statute is ignored and contorted and some other valuation is used as the denominator was the Defendant justified in continuing to collect PMI premiums from the Plaintiff.

## STANDARD OF JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Where there is no genuine issue of material fact, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.,* 477 U.S. at 249 (citations omitted).

When a movant is able to show an absence of material fact, the non-moving party "must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial."  *Patrick v. PHH Mortg. Corp.,* 998 F. Supp.2d 478, 484 (N.D.

4

W. Va. 2014) (*citing* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986); *Anderson,* 477 U.S. at 248).

For the most part, the parties to this case do not dispute the material facts.  (See Stipulated Facts, attached as Exhibit A).  The parties' dispute concerns the correct application of the Homeowner's Protection Act to the facts of this case.

## ARGUMENT

**I.     The Homeowner's Protection Act ensures that homeowners are entitled to termination of PMI coverage at a specific point in the life of their mortgage loans.**

After what it determined were abusive practices in the mortgage industry, Congress passed the Homeowner's Protection Act ("HPA") to prohibit mortgage servicers from collecting PMI premiums after a termination date.  S. Rep. No. 105-129 (1997).  The law set various formulas for calculating the termination dates based on the type of loan involved.  The HPA gave teeth to the prohibition against collecting PMI premiums after termination dates by providing for civil penalties, including payment of attorney fees.  *See* 12 U.S.C. 4907 ("Civil Liability").

Section 4902 is the heart of the HPA.  It provides for three circumstances under which private mortgage insurance must be terminated.  Titled "Termination of private mortgage insurance," this section provides, in relevant part, as follows:

> (a)  Borrower cancellation. A requirement for private mortgage insurance in connection with a residential mortgage transaction shall be canceled on the cancellation date or any later date that the mortgagor fulfills all of the requirements under paragraphs (1) through (4), if the mortgagor--
>      (1)  submits a request in writing to the servicer that cancellation be initiated;

(2)  has a good payment history with respect to the residential mortgage;

(3)  is current on the payments required by the terms of the residential mortgage transaction; and

(4)  has satisfied any requirement of the holder of the mortgage (as of the date of a request under paragraph (1)) for--

(A)  evidence (of a type established in advance and made known to the mortgagor by the servicer promptly upon receipt of a request under paragraph (1)) that the value of the property securing the mortgage has not declined below the original value of the property; and

(B)  certification that the equity of the mortgagor in the residence securing the mortgage is unencumbered by a subordinate lien.

(b)  Automatic termination. A requirement for private mortgage insurance in connection with a residential mortgage transaction shall terminate with respect to payments for that mortgage insurance made by the mortgagor--

(1)  on the termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction; or

(2)  if the mortgagor is not current on the termination date, on the first day of the first month beginning after the date that the mortgagor becomes current on the payments required by the terms of the residential mortgage transaction.

(c)  Final termination. If a requirement for private mortgage insurance is not otherwise canceled or terminated in accordance with subsection (a) or (b), in no case may such a requirement be imposed on residential mortgage transactions beyond the first day of the month immediately following the date that is the midpoint of the amortization period of the loan if the mortgagor is current on the payments required by the terms of the mortgage.

12 U.S.C. § 4902.

Both Plaintiff and Defendant agree that two of these three circumstances are inapplicable.  Plaintiff is not seeking "borrower cancellation" or "final termination" of PMI; instead, Plaintiff is seeking to enforce the automatic termination date.  That makes subsections (a) and (c) of Section 4902 not relevant.

6

Moreover, the Plaintiff and Defendant agree that the subsection of Section 4902 that is relevant to this case is (b).  Subsection (b), quoted above, provides the conditions under which a borrower's obligation to pay PMI premiums automatically terminates.

Another relevant part of Section 4902 is subsection (d); which provides that an automatic termination date must be modified pursuant to the terms and conditions of a loan modification:

> (d)  Treatment of loan modifications. If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.

12 U.S.C. § 4902.

Both parties agree that the Court must apply both subsections (b) and (d) to make its determination.

## II.   Under the HPA and the undisputed facts of the case, the Plaintiff's PMI should have automatically terminated either on January 1 or March 1, 2014.

What the parties do not agree on is when the actual automatic termination date was. Before the loan modification, there is no question that the automatic termination date was January 1, 2016.  Stipulated Facts, ¶ 4.  Indeed, Plaintiff signed a disclosure statement acknowledging that automatic termination date.  Stipulated Facts, Ex. A-1.

However, Plaintiff and the investor of Plaintiff's loan entered into a loan modification agreement.  Stipulated Facts, ¶¶ 7-9.  After any loan modification, Section 4902(d) requires that termination dates must be recalculated to reflect "the modified terms and conditions of such loan."

To recalculate Plaintiff's termination date, and to apply subsections (b) and (d) of Section 4902, the Court must look to the definitions contained within Section 4901.

The termination date referenced in both subsections (b) and (d) of Section 4902 is defined as follows:

(18)  Termination date. The term "termination date" means-- […]

 (B)  with respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

12 U.S.C. § 4901(18).

By virtue of the definition provided in the statute, the automatic termination date for PMI on adjustable rate loans, such as the Plaintiff's loan, occurs on the termination date, which is when the outstanding principal balance is first scheduled to reach 78 percent of the "original value" of the property securing the loan.[4]  *See* 12 U.S.C. § 4901(18).

As a formula, the statute would read like this:

---

[4]  Both parties agree that the Plaintiff's loan, as modified, is an adjustable rate loan.  Adjustable rate loans are defined as follows:

(1)  Adjustable rate mortgage. The term "adjustable rate mortgage" means a residential mortgage that has an interest rate that is subject to change. A residential mortgage that: (A) does not fully amortize over the term of the obligation; and (B) contains a conditional right to refinance or modify the unamortized principal at the maturity date of the term, shall be considered to be an adjustable rate mortgage for purposes of this Act.

12 U.S.C. § 4901.  Because it is a "step" rate loan, it has an interest rate that is subject to change and is therefore adjustable.  Stipulated Facts, ¶ 9, Ex. A-2.

$$\frac{\underline{\text{Outstanding principal balance}}}{\text{Original Value}} \quad = \quad 78\%$$

In addition to defining "termination date," the HPA also defines "original value":

(12)  Original value. The term "original value", with respect to a residential mortgage transaction, means the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated. In the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction.

12 U.S.C. § 4901.

Thus, the "original value" is the lesser of either (1) the sales price of the property, as reflected in the contract by which the Plaintiff purchased the property, which was $395,000, or (2) the appraised value at the time the mortgage was consummated, which was $452,000.  *See* Stipulated Facts, ¶ 2.

Because the contract purchase price of $395,000 is less than the appraised value of $452,000, the "original value" of Plaintiff's property is $395,000.  The statute defining termination date thus *requires* the denominator to be $395,000.

The equation thus becomes

$$\frac{\underline{\$X}}{\$395,000} \quad = \quad 78\%$$

In order for the outstanding principal balance – X in the equation – to become 78% of the original value, X must equal $308,100.

In November 2013, Defendant provided to Plaintiff an amortization schedule.  See Ex. B, Cover letter with Amortization Schedule.  Defendant asserts that around the same time, someone from Defendant generated another amortization schedule.  See Ex. C.[5]

According to the amortization schedule provided to Mr. Rice, the outstanding principal balance on January 1, 2014, would have been $307,786.62, which is the first time that the ratio of outstanding principal balance to original value fell below 78%.

$$\frac{\$307,786.62}{\$395,000.00} \quad = \quad 77.92\%$$

In other words, using the "original value" as required by the statute, the automatic termination date should have been January 1, 2014.

According to the amortization schedule provided during discovery, the outstanding principal balance on March 1, 2014, would have been $307,585.74, which is the first time under that second amortization schedule that the ratio of principal balance to original value fell below 78%.

$$\frac{\$307,585.74}{\$395,000.00} \quad = \quad 77.86\%$$

Using the first amortization schedule, the automatic termination date was January 2014; using the newly produced amortization schedule, the termination date was March

---

[5] Plaintiff's position throughout the litigation is that his automatic termination date would be determined using the amortization schedule then in effect, which had always been the amortization schedule provided to him by Green Tree in November 2013.  Now, in the week that Plaintiff's motion for summary judgment is due to the Court, Green Tree has indicated for the first time that the amortization schedule it had earlier provided to Mr. Rice was incorrect.  Instead, there was another amortization schedule, which had never been provided to Mr. Rice, which should be used to do any calculations.  With a minor exception, it does not matter which amortization schedule is used.  Under the one provided to Mr. Rice, the termination date was January 1, 2014; under the amortization schedule produced during discovery, the termination date was March 1, 2014.  Under both amortization schedules, Green Tree violated the HPA.

2014.  Under both amortization schedules, Defendant has been collecting from Plaintiff

$188.10 in PMI insurance premiums every month.  See Stipulated Facts, ¶ 10.   As of the

date of this Motion for Summary Judgment, Plaintiff has paid this additional PMI

premium either 15 or 13 times.  Under the first amortization schedule, Defendant charged

extra PMI fifteen times:  15 x $188.10 = $2,821.50.   Under the new amortization

schedule, Defendant charged extra PMI thirteen times:  13 x $188.10 = $2,445.30.

**III.    Under the HPA, Defendant is civilly liable to Plaintiff for continuing to charge him a PMI premium after the automatic termination date.**

The HPA has a section providing for civil liability for mortgage servicers who

violate its provisions:

> Civil Liability
>
> (a)  In general. Any servicer, mortgagee, or mortgage insurer that violates a provision of this Act shall be liable to each mortgagor to whom the violation relates for--
>
> (1)  in the case of an action by an individual, or a class action in which the liable party is not subject to section 10 [12 USCS § 4909], any actual damages sustained by the mortgagor as a result of the violation, including interest (at a rate determined by the court) on the amount of actual damages, accruing from the date on which the violation commences;
>
> (2)  in the case of--
>
> (A)  an action by an individual, such statutory damages as the court may allow, not to exceed $ 2,000; and
>
> (B)  in the case of a class action--
>
> (i)  in which the liable party is subject to section 10 [12 USCS § 4909], such amount as the court may allow, except that the total recovery under this subparagraph in any class action or series of class actions arising out of the same violation by the same liable party shall not exceed the lesser of $ 500,000 or 1 percent of the net worth of the liable party, as determined by the court; and
>
> (ii)  in which the liable party is not subject to section 10 [12 USCS § 4909], such amount as the court may allow, not to exceed $ 1,000 as to each member of the class, except that the total recovery under this subparagraph in any class action or series of class actions arising out of the same violation by the same liable party shall not exceed the lesser of

$ 500,000 or 1 percent of the gross revenues of the liable party, as determined by the court;

      (3)  costs of the action; and

      (4)  reasonable attorney fees, as determined by the court.

12 U.S.C. § 4907.

By charging Plaintiff the PMI premium after the automatic termination dates of either January 1 or March 1, 2014, Defendant Green Tree Servicing violated the provisions of the HPA.  As a result, Green Tree Servicing is liable to Plaintiff for actual damages, which are either $2,821.50, the amount of PMI premiums that Plaintiff has paid since February 1, 2014, or $2,445.30, the amount of PMI premiums that Plaintiff has paid since April 1, 2014.

Defendant is also liable for interest.  The statute provides that interest begins accruing on the date the violation commences, which would be either February or April 2014.  The statute also provides that the Court determines the appropriate rate.  Potential interest rates include the statutory rate of interest in West Virginia in 2014, which was 7.00%.  See Ex. D, Administrative Order of the West Virginia Supreme Court of Appeals dated January 3, 2014.  Another possible interest rate would be the interest rate that Plaintiff was paying for his mortgage in 2014, which was 3.00%.  See Stipulated Facts, Ex. A-2.

Defendant is also liable for the $2,000 statutory penalty.

Defendant is also liable for the costs of the action, plus reasonable attorney fees. Plaintiff seeks a hearing following this Court's ruling on the Plaintiff's Motion for

Summary Judgment to determine Plaintiff's reasonable attorney fees and costs of the action.

## IV.    The Defendant's refusal to terminate PMI ignores the express language of the HPA.

The Defendant believes that, instead of using the original value of the loan as required by the definition of "termination date" in the HPA, the Defendant should have used a *new* valuation of the property conducted at the time of the loan modification as the denominator.

There can be no mistake:  the statute itself does *not* provide for using anything other than the original value as the denominator.  In order to avoid the definition of termination date contained in the statute, Defendant instead relies upon Fannie Mae's Servicing Guidelines.

This deviation from the plain language of the statute is inappropriate and unjustified.  The HPA itself specifically supersedes Fannie Mae's Servicing Guidelines:

> (b)  Effect on other agreements. The provisions of this Act shall supersede any conflicting provision contained in any agreement relating to the servicing of a residential mortgage loan entered into by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any private investor or note holder (or any successors thereto).

12 U.S.C. § 4908.

Defendant justifies its deviation from the plain language of the statute and its disregard of Section 4908 by reference to subsection (d) of Section 4902.  Subsection (d) was enacted in 2000, after the original law, because of concerns by the mortgage industry about how to calculate PMI termination dates when loans are modified.

This subsection (d), which is the same subsection upon which Plaintiff relies in order to recalculate the termination date, states as follows:

> (d)  Treatment of loan modifications. If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.
> […]

12 U.S.C. § 4902.

The requirements of Defendant's position go well beyond just looking to the modified terms and conditions of the loan.  Instead, Defendant's position is that to recalculate the termination date, you must use information used by the underwriters in determining whether to approve the loan modification in the first place.  In particular, Defendant believes that the value of the property at the time of the loan modification, which was used by the underwriters in determining whether or not the loan modification should be approved, must be used to determine the termination date.  Defendant holds this untenable position even though the valuation of the property at the time of loan modification is not a term or condition of the loan modification.  Indeed, Defendant's position is that even the express terms and conditions written into the loan modification agreement are not enough.

This cannot be the case.  First, subsection (d) states that "termination date" must be recalculated following a loan modification.  The very definition of termination date requires the use of "original value" as the denominator.  No other valuation can be possible.

14

Moreover, subsection (d) states that the "terms and conditions of such loan" must be considered.  Here, the terms and conditions of the loan that were modified in the Home Affordable Modification Agreement, attached to the Stipulated Facts as Ex. A-2, are found in paragraph 3, which is titled "The Modification."  In particular, these are the changes to the terms and conditions:  (1) the maturity date was changed to September 1, 2036;  (2) the new principal balance was changed to $340,123.01 and (3) the new interest rates varied from 3% in years 1 to 5, to 4% in year 6, to 4.375% in the remaining years of the loan.

Importantly, nowhere in the Home Affordable Modification Agreement is the value of the property even mentioned, much less made a term or condition agreed to by the Plaintiff and the note holder.  It is clear:  there is no term or condition related to the value of the property at the time of the loan modification.  Because there is nothing in the loan modification agreement regarding a new valuation of the property, the necessary recalculation of the termination date cannot take into account any such new valuation.

It is important to note that the termination date as recalculated by Plaintiff using the definitions provided in the statute was recalculated to take into account these modified terms and conditions.  In particular, the new maturity date, principal balance, and interest rate changed the amortization schedule then in effect.  Instead of the automatic termination date being what it was in the original disclosures in 2006 – January 2016 – the termination date shifted with the new terms, just as subsection (d) requires, to either January or March 2014.

Defendant may argue that the granting of the loan modification necessarily relied upon the Defendant's use of a new valuation to determine whether the Plaintiff could qualify for the loan modification.  That may be true.  But simply because the underwriting of the loan took into account a new valuation does not mean the new valuation was a term or condition of the loan.  The new valuation did not change any obligations on the part of either the Plaintiff or the Defendant.  On the other hand, the new maturity date, the new principal balance, and the new interest rates *did* change the Plaintiff's and Defendant's obligations.  These modified terms and conditions changed the termination date.  The valuation used in underwriting the loan modification did not change anyone's obligations.

The valuation of a piece of real estate at loan modification is not a term or condition of a loan modification, just as a borrower's income is not a term or condition.  Everyone knows that home values will change, just as everyone knows that income is likely to change over the thirty-year life of a loan.  Property valuation and borrower's income are important pieces of information for those who perform underwriting, whether at loan origination or at loan modification, but they do not become a term or condition of a loan.

If a borrowers income were a term or condition of a loan, would the termination date for PMI change with a job loss?  How about with a raise? For obvious reasons, every factor considered during the underwriting of a loan is not a term or condition of the loan itself.

The only time that the changing value of a home can be taken into account when determining termination dates is under 12 U.S.C. § 4902(a), which is the subsection dealing with when a consumer requests that PMI end before the automatic termination date.  In particular, this subsection provides that the borrower satisfy "any requirement of the holder of the mortgage (as of the date of a request under paragraph (1)) for--  (A)  evidence (of a type established in advance and made known to the mortgagor by the servicer promptly upon receipt of a request under paragraph (1)) that the value of the property securing the mortgage has not declined below the original value of the property […]. "  In other words, a borrower can request that his PMI end by proving that his home value increased.

For automatic termination, however, the termination date must use the "original value" of the property, not some new valuation, because that is what the HPA requires.

Defendant's use of Fannie Mae Servicing Guidelines or underwriting information is improper.  Property valuations that are not a part of the terms and conditions of a loan modification cannot be used to force a borrower to pay PMI past the automatic termination date, as modified by a loan modification.

**V.    The Defendant's violation of the HPA is also a violation of the West Virginia Consumer Credit and Protection Act.**

The West Virginia Consumer Credit and Protection Act ("WVCCPA") prohibits a debt collector such as Defendant from making "any false representation or implication of

the character, extent or amount of a claim against a consumer." W. Va. Code § 46A-2-127(d). Each time that Defendant Green Tree informed Plaintiff after January 1, 2014, or March 1, 2014, that he owed the PMI premium, it misrepresented the amount of money that Plaintiff actually owed. Each month where Defendant sent a statement including a PMI premium as money that was due is thus a violation of this provision of the WVCCPA. For instance, Defendant sent to Plaintiff statements every month with an amount that included PMI. See, e.g., Ex. E, Jan. 2014 statement; see also Ex. F, Feb. 2014 Escrow Disclosure Statement. Defendant acknowledges that Plaintiff has continued to make his monthly payments every month. Stipulated Facts, ¶ 10. With each monthly payment, Defendant has violated the WVCCPA.

W.Va. Code § 46A-5-101 provides that the Court can award a civil penalty against debt collectors such as Green Tree who violate the unlawful debt collection provisions of the WVCCPA, including Section 127(d). That penalty ranges from $100 per violation to $1,000. W.Va. Code § 46A-5-106 allows the Court to adjust the penalty for inflation. Adjusted for inflation, the penalty can be anywhere from $476.11 per violation to $4,761.10. See Ex. G, Bureau of Labor Statistics website calculation.

Defendant has violated the provision either 15 or 13 separate times. The penalty for all of these violations can be as high as $71,416.50, if the Court were to award the maximum penalty allowable. Considering that this question is one of first impression – Plaintiff's counsel could find no written decisions directly on point – the minimum penalty adjusted for inflation seems more appropriate. Thus, Plaintiff seeks either $7,141.65 or $6,189.43 in civil penalties under W.Va. Code §46A-5-101. Only if

Defendant violates this provision in the future would higher penalties be warranted.

## CONCLUSION

No genuine issues of material fact exist in this case, and all that remains for this Court to do is apply the law to the undisputed facts.  Because the statute requires, the only denominator that can be used for the recalculation of the termination date for PMI is the original value.  Because there is no valuation of Plaintiff's property that is a term or condition of the loan modification, the only denominator that can be used for the recalculation of the termination date for PMI is the original value.  As described above, using the original value of $395,000 means that either January 1 or March 1, 2014, is the termination date.  That means that Defendant Green Tree has violated the HPA every single month since either February or April 2014, which means that it must pay Plaintiff back what he overpaid, plus interest, plus the $2,000 statutory penalty, plus it must pay reasonable attorney fees and costs of the case.  Further, Green Tree misrepresented what Plaintiff owed, which is a violation of the WVCCPA and warrants a penalty in the amount of either $7,141.65 or $6,189.43.


Curt Rice
By Counsel

/s/ Andrew C. Skinner
Andrew C. Skinner (WV Bar No. 9314)
SKINNER LAW FIRM
P.O. Box 487
Charles Town, WV 25414
(304) 725-7029/Fax: (304) 725-4082
askinner@skinnerfirm.com

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICTOF WEST VIRGINIA
### Martinsburg Division

**CURT RICE,**

      **Plaintiff,**

**v.**                                 **Civil Action No. 3:14-CV-93 (Groh)**

**GREEN TREE SERVICING, LLC,**

      **Defendant.**


### CERTIFICATE OF SERVICE

I, Andrew C. Skinner, of the SKINNER LAW FIRM, counsel for the Plaintiff do hereby certify that on this 30th day of April, 2015, I electronically filed the foregoing **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following counsel:

Debra Lee Hovatter, Esquire
Spilman Thomas & Battle, PLLC
48 Donley Street, Suite 800
Post Office Box 615
Morgantown, West Virginia  26507-0615


                                 /s/ Andrew C. Skinner
                                 Andrew C. Skinner