UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CURT RICE,

       Plaintiff,

v.                                     CIVIL ACTION NO. 3:14-CV-93 (Groh)

GREEN TREE SERVICING, LLC,

       Defendant.

**GREEN TREE SERVICING, LLC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Green Tree Servicing, LLC ("Green Tree") respectfully submits this Memorandum in Support of its Motion for Summary Judgment.

### I.    <u>OVERVIEW</u>

This case is about private mortgage insurance ("PMI") and whether the PMI that was required for plaintiff Curt Rice's ("Plaintiff") deed of trust loan should have already terminated pursuant to the Homeowners Protection Act ("HPA"), 12 U.S.C. § 4901 *et seq*. By law, the requirement for PMI will automatically terminate when the loan reaches the "termination date" (herein, the "Automatic Termination Date"), defined as the date that the principal balance of the mortgage loan -- based on the loan's initial amortization schedule -- reaches 78% of the property's value at origination. 12 U.S.C. § 4901(18).

Plaintiff contends the PMI on his loan should have terminated on January 1, 2014, the date he claims is the Automatic Termination Date. Therefore, Plaintiff alleges, Green Tree violated the HPA by continuing to charge Plaintiff a premium for PMI and the West Virginia

Consumer Credit and Protection Act ("WVCCPA") by falsely representing that monthly premium amounts were due.

Green Tree contends the Automatic Termination Date is February 1, 2020, and consequently, there has been no violation of the HPA or the WVCCPA.

The parties agree on the amortization schedule to be used for calculating the Automatic Termination Date, which, as explained herein, is the amortization schedule that commences with Plaintiff's loan modification in 2010, using the modified terms. However, the parties dispute the denominator for determining the 78%, i.e., the value of the property. Plaintiff argues the denominator should be the value of the property in 2006 when his loan originated. Green Tree contends – and argues that applicable law dictates -- that the denominator must be the value of the property at the time of the loan modification in 2010.

Which valuation to use to calculate the Automatic Termination Date is the sole issue for this Court to decide. The denominator will determine the Automatic Termination Date, whether the PMI on Plaintiff's Loan has terminated, and whether Plaintiff has a claim against Green Tree for violating the HPA and the WVCCPA.

## II.   PROCEDURAL HISTORY

Plaintiff filed his Complaint in the Magistrate Court of Jefferson County, West Virginia on January 21, 2014. He alleged he was being billed and funds were being removed from his escrow account to pay for PMI after the Automatic Termination Date had passed. Green Tree responded with a motion to dismiss, which was granted on June 23, 2014.

Plaintiff appealed the Magistrate's dismissal to the Circuit Court of Jefferson County. On July 24, 2014, with leave of Court, Plaintiff filed his First Amended Complaint. Green Tree

removed the action to this Court on August 8, 2014, where it remains pending after this Court denied Plaintiff's Motion for Remand.

Plaintiff alleges just two Counts against Green Tree, both of which are based on Plaintiff's argument that the PMI on his loan should have automatically terminated: Count One for violation of the HPA, 12 U.S.C. § 4901 *et seq.*, and Count Two for violation of the WVCCPA, W. Va. Code § 46A-2-127(d).

Pursuant to this Court's Scheduling Order, entered October 8, 2014, discovery was completed on April 3, 2015. Dispositive motions must be filed on or before April 30, 2015, and trial is set for October 13, 2015. The parties believe this matter can be resolved on summary judgment motions because there are no disputes regarding the material facts.

### III. MATERIAL FACTS

A. Stipulated Facts

The parties have stipulated to certain facts, which are attached as **Exhibit A** to Green Tree's Motion for Summary Judgment. For ease of reference, the facts are restated herein:

1. Plaintiff obtained a loan on or about August 24, 2006 in the original principal amount of $355,550 ("Loan"), which loan is secured by a Deed of Trust that encumbers Plaintiff's residential real property at 97 Stephanie Way, Charles Town, West Virginia ("Property").

2. The appraised value of Plaintiff's Property at origination of Plaintiff's Loan, i.e., on or about August 24, 2006, was $452,000. Plaintiff's Loan financed the purchase of the Property in August 2006. The contract purchase price was $395,000.

3. The terms of Plaintiff's Loan required him to purchase and maintain Private Mortgage Insurance. On or about August 24, 2006, Plaintiff executed a Private Mortgage Insurance Disclosure, a copy of which is attached to Exhibit A as **Exhibit A-1**.

4. Based on an amortization schedule using the terms of Plaintiff's Loan at origination, i.e., original principal amount of $355,550, interest of 6.75%, and a 30 year term, and using the value of the Property at origination, Plaintiff's PMI would automatically terminate, assuming Plaintiff's loan payments were current, on January 1, 2016. (Ex. A-1, "Automatic Termination of PMI.")

5. On or about October 16, 2006, Plaintiff's Loan was acquired by the Federal National Mortgage Association ("Fannie Mae"). Fannie Mae is currently the investor of Plaintiff's Loan.

6. Plaintiff's Loan was serviced by Bank of America, N.A. (also doing business as Countrywide Home Loans Servicing or BAC Home Loan Servicing), for Fannie Mae, until June 1, 2013.

7. In 2010, while Plaintiff's Loan was being serviced by Bank of America, N.A., Plaintiff obtained a modification of his Loan through the Home Affordable Modification Program ("HAMP"), which was offered by Fannie Mae.

8. Plaintiff signed the HAMP Loan Modification on or about September 8, 2010 ("Loan Modification"), a copy of which is attached to Exhibit A as **Exhibit A-2**.

9. The Loan Modification changed the terms of Plaintiff's Loan. The new principal balance became $340,123.01. The interest rate became a "step" rate, which is detailed on page 3, paragraph C of **Exhibit A-2**, attached to Exhibit A. The new maturity date is September 1, 2036.

10. Plaintiff has continued to make the monthly payments due on his Loan, as modified by the Loan Modification, and, as of the date of this Memorandum, Plaintiff is current on his

payments. His monthly payment includes an amount required to pay the premium for PMI, which has been $188.10 per month since at least June of 2013.

11. On June 1, 2013, servicing of Plaintiff's Loan was transferred to Green Tree.

12. Green Tree continues to service Plaintiff's Loan for Fannie Mae.

13. For purposes of determining the date that Plaintiff's PMI would automatically terminate after loan modification, the amortization schedule should be one run from the time of the loan modification, i.e., from September 1, 2010, based upon the modified terms of Plaintiff's Loan, i.e., the modified principal balance of $340,123.01, maturity on September 1, 2036, and accrual of interest at a "step" rate.

B. Undisputed Facts

The following facts are not stipulated by the parties, but are undisputed:

14. Green Tree has serviced and continues to service Plaintiff's Loan in accordance with Fannie Mae's Servicing Guidelines, which can be found online at www.fanniemae.com/content/guide/servicing. Affidavit of Stewart M. Derrick, Regional Manager for Green Tree, attached to Green Tree's Motion for Summary Judgment as **Exhibit B**. The sections of the Fannie Mae Servicing Guidelines that are pertinent to this matter are attached to Exhibit B as **Exhibit B-1** and include: Section D2-3.2-07, "Fannie Mae HAMP Modification" (pp. 457-468; Section F-1-18, "Processing a Fannie Mae HAMP Modification" (pp. 811-822; and Section B-8.1-04, "Termination of Conventional Mortgage Insurance" (pp. 305-312).

15. To determine whether a borrower can qualify for a HAMP loan modification, the servicer is required by the Fannie Mae Servicing Guidelines to evaluate the mortgage loan using a standard Net Present Value ("NPV") test. The NPV test requires the servicer to obtain a

recent valuation of the property that secures the loan. The valuation cannot be more than 90 days old. (Ex. B, ¶ 6; Ex. B-1, Section D2-3.2-07, pp. 458-9; and Section F-1-18, pp. 814-815.)

16. In 2013, after servicing of Plaintiff's Loan was transferred to Green Tree, Green Tree determined, based on information the prior servicer had provided to Fannie Mae, that the prior servicer had obtained in 2010 a value of $237,603 for Plaintiff's Property. (Ex. B, ¶ 7.)

17. The value was obtained at the time Plaintiff applied for a HAMP loan modification. (*Id*.) However, Green Tree found none of the documentation for this valuation that is required by the Fannie Mae Servicing Guidelines. (*Id*.)

18. Therefore, in order to complete the documentation requirements for the Fannie Mae Servicing Guidelines, Green Tree obtained in 2013 another valuation of Plaintiff's Property. (*Id*., ¶ 8.) The valuation was obtained from a vendor using an Automated Valuation Model ("AVM"), as is permitted by the Fannie Mae Servicing Guidelines. (*Id*., ¶ 9, and Ex. B-1, Section F-1-18, pp. 814-15. The vendor returned a value of $322,700 for Plaintiff's Property. (*Id*.) This is the value Green Tree has used for purposes of Plaintiff's Loan Modification. (*Id*.) The $322,700 value is referred to herein as the "Loan Modification Value."

19. On or about December 2, 2013, in response to Plaintiff's request for the date that his PMI would automatically terminate after his loan modification, Green Tree ran an amortization schedule for Plaintiff's Loan, from the time of the loan modification, based upon the terms of his loan modification, i.e., the modified principal balance of

$340,123.01, maturity on September 1, 2036, and accrual of interest at a "step" rate. The modified Loan amortization schedule is attached to Exhibit B as **Exhibit B-2**.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(a). A genuine issue of fact exists when the facts could reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When evidence is merely colorable or does not have significant probative effect, i.e., is not material, summary judgment may be granted. (*Id*., 249 (citations omitted).) The nonmoving party cannot rest upon "mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." (*Id*., 256.)

## V. ARGUMENT

**A. The Automatic Termination Date After Loan Modification Is Calculated Using An Amortization Schedule Based On The Loan Modification Terms And The Value Of The Property That Secures The Loan As Of The Time Of The Loan Modification; Plaintiff's Automatic Termination Date is February 1, 2020**

An understanding of PMI and more specifically, the statutory provisions that govern termination of PMI, is necessary to set the framework for Green Tree's argument.

### 1. *Private Mortgage Insurance*

PMI is insurance that protects a lender from the risk of mortgage default. It has been available for nearly 60 years. *See* S. Rep. 105-129, at 2 (1997) (1997 WL 688537). Today, it is most commonly used to facilitate high loan-to-value ("LTV") loans, i.e., loans for which the LTV ratio exceeds 80%. (*Id*.)

7

Historically, terms for a residential mortgage loan have required a 20% down payment by the borrower. The availability of PMI allows a borrower with limited cash to purchase a home without a 20% down payment. Hence, PMI is recognized as a means for "allowing low-income borrowers or borrowers with little cash greater access to home ownership." H.R. Rep. 105-55, at 6 (1997) (1997 WL 188469).

Until 1997, the terms for cancelling PMI varied among states and lenders. (*Id*.) The general industry practice was to allow termination of PMI when the LTV reached 80% and the homeowner had a good payment history. But there were no "uniform termination guidelines." (*Id*.) Recognizing the need for consistency and disclosures, Congress enacted the Homeowners Protection Act, which is codified at 12 U.S.C. § 4901 *et seq*.

2.     *Canceling PMI*

Cancellation of PMI is governed by 12 U.S.C. § 4902. It can be done in one of two ways: borrower-requested cancellation or automatic termination. A borrower can request cancellation of PMI when the loan's principal balance  -- based on *actual payments made* -- reaches 78% - 80% of the property's value, assuming all other conditions are met. *See* 12 U.S.C. § 4902(a). In contrast, automatic termination occurs when the loan's principal balance -- based on *an amortization schedule* from the time of origination  – reaches 78% of the property's value at origination. 12 U.S.C. § 4902(b). In each case, the borrower must be current on his payments due under the terms of his note.

Plaintiff is not requesting cancellation of the PMI on his Loan, i.e., borrower-requested cancellation. Therefore, this option will not be discussed further.

Rather, Plaintiff is claiming that the PMI should have automatically terminated based on the Automatic Termination Date.

Automatic termination is defined in 12 U.S.C. § 4902(b). PMI will terminate

(1) on the termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction; or
(2) if the mortgagor is not current on the termination date, on the first day of the first month beginning after the date that the mortgageor becomes current on the payments required by the terms of the residential mortgage transaction.

12 U.S.C. § 4902(b)(1) and (2).

Plaintiff is current on the payments required by his Loan. (Ex. A, ¶ 10.) Hence, only subsection (1) applies.

"Termination date," as used in the description of "Automatic termination" quoted above, is defined in 12 U.S.C. § 4901(18) as

the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; . . . .

12 U.S.C. § 4901(18)(A).

"Original value," as used in the definition of "termination date" quoted above, is defined in 12 U.S.C. § 4901(12) as "the lesser of the sales price of the property securing the mortgage, . . . or the appraised value at the time at which the subject residential mortgage transaction was consummated."

Similarly, "initial amortization schedule," as used in the definition of "termination date" quoted above, is defined in 12 U.S.C. § 4901(5) to mean

A schedule established at the time at which a residential mortgage transaction is consummated . . . , showing--
(A) the amount of principal and interest that is due at regular intervals to retire the principal balance and accrued interest over the amortization period of the loan; and
(B) the unpaid principal balance of the loan after each scheduled payment is made.

12 U.S.C. § 4901(5).

9

Applying the statutory definitions to this case at the time of origination of Plaintiff's Loan in 2006, the value of Plaintiff's Property to be used for calculating the Automatic Termination Date was $395,000, i.e., the lesser of the sales price or appraised value at origination. (Ex. A, ¶ 2.) The amortization schedule used was based upon the original terms of Plaintiff's Loan. Based on these two factors, Plaintiff's Automatic Termination Date after origination was January 1, 2016. (*See* Ex. A-1.)

However, Plaintiff's Loan was modified in 2010, which changed the terms that would be used to run an amortization schedule.

3.  *Termination of PMI after Loan Modification*

The HPA enacted in 1997 did not address the effect of a loan modification on the terms for cancellation of PMI. Obviously, when a loan is modified, its terms change, so the initial amortization schedule would no longer be appropriate.

In 2000, Congress addressed this gap in the statute when it passed the American Homeownership and Economic Opportunity Act of 2000. 146 Cong. Rec. H11960-01 (2000) (2000 WL 1783644). Section 402(d) of the Act amended the HPA to add 12 U.S.C. § 4902(d):

> If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan.

12 U.S.C. § 4902(d).

No other conforming changes were made to the statute, only to state that the new cancellation and termination dates must reflect the *modified terms and conditions* of the loan. The Fannie Mae Servicing Guidelines similarly use the modified terms and conditions to determine mortgage insurance termination eligibility, specifying that the servicer must "use the

10

amortization schedule of the modified mortgage loan and the property value at the time of the mortgage loan modification, . . . " (Ex. B-1, Section B-8.1-04, pg. 311.)

In this case, to determine the modified terms and conditions of the loan modification, one must look back to Plaintiff's Loan Modification and the HAMP program under which Plaintiff obtained his Loan Modification.

**4.**     ***The Home Affordable Modification Program ("HAMP")***

The Home Affordable Modification Program ("HAMP") was a response to the 2008 mortgage crisis. Its purpose was "to assist homeowners who [were] in default or in imminent danger of defaulting on their mortgages by reducing their monthly payments to sustainable levels." *Nicdao v. Chase Home Finance*, 839 F.Supp.2d 1051, 1065 (D. Alaska 2012). Specifically, the Emergency Economic Stabilization Act of 2008, §§ 101 and 109, authorized and required the Secretary of the U.S. Treasury to "implement a plan that seeks to maximize assistance for homeowners and . . . encourage the servicers of the underlying mortgages . . . to take advantage of available programs to minimize foreclosures." 12 U.S.C. § 5219(a).

In response, the Secretary created a program whereby participating servicers were directed to offer loan modification terms to eligible borrowers in accordance with the Treasury Program's directives. The terms offered to borrowers, as well as the process by which servicers are to determine a borrower's eligibility, are specified by the Treasury directives. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556 (7th Cir. 2012), citing U.S. Dep't of the Treasury, Home Affordable Modification Program Supplemental Directive 09-01 (Apr. 6, 2009), for a more detailed explanation of the loan modification process required by HAMP.

A Net Present Value ("NPV") test, which compares the value of the modified mortgage with the servicer's expected return after foreclosure of the unmodified mortgage, is integral to

the loan modification process. (*Id.* at 577; *See also*, 12 U.S.C. § 5219-19a, detailing "Foreclosure Mitigation Efforts" and "Home Affordable Modification Program Guidelines," requiring the Net Present Value analysis; and Ex. B-1, Section F-1-18, pp. 814-15.) In order to complete the NPV test, which is a condition of the HAMP loan modification process, the servicer must obtain a current value of the property securing the mortgage. (Ex. B, ¶ 6; Ex. B-1, Section F-1-18, pp. 814-15.)

      **5.**    *The Terms and Conditions of Plaintiff's Loan Modification Used to Calculate the Post-Loan Modification Automatic Termination Date of February 1, 2020*

The parties agree that in order to determine the date that Plaintiff's PMI would automatically terminate after loan modification, a new amortization schedule must be run from the time of the loan modification, i.e., from September 1, 2010, using the modified terms of Plaintiff's Loan. (Ex. A, ¶ 13.) The modified terms are:

    (i)    Principal balance at modification: $340.123.01.

    (ii)    Interest Rate: 3% until 8/1/2015; 4% until 8/1/2015; 4.375% thereafter.

    (iii)    Maturity Date: September 1, 2036.

    (iv)    First payment due: September 1, 2010.

(Ex. A, ¶ 9; Ex. A-2.)

These are the terms used to run the amortization schedule that was prepared by Green Tree on or about December 2, 2013, and is attached to Exhibit B as Exhibit B-2. The amortization schedule was run in response to Plaintiff's request for his new automatic termination date. (Ex. B, ¶ 11, Ex. B-2.)

In addition, the value of Plaintiff's Property at the time of loan modification is a term or *condition* of the Loan Modification, i.e., to complete the NPV test, and therefore, must be used to calculate the new Automatic Termination Date after Loan Modification. As already discussed

above, the value of Plaintiff's Property used by Green Tree for purposes of the Loan Modification is $322,700. *Supra*, "Material Facts," ¶ 18.

Accordingly, using the amortization schedule that is Exhibit B-3, the principal balance falls below 78% of the Plaintiff's Property's value at the time of modification, i.e., 78% of $322,700 or $251,706, on February 1, 2020.[1] (Ex. B, ¶ 12.) Assuming Plaintiff continues to make his monthly payments timely, this is the date on which Plaintiff's PMI will automatically terminate, i.e., the post-Loan Modification Automatic Termination Date.

**B.    Section 4908(d) Of HPA Must Be Read To Apply To All Factors Used To Determine The New Automatic Termination Date.**

Plaintiff contends the Automatic Termination Date should be calculated using the amortization schedule that is based on the modified loan terms from 2010, but using the value of the property at origination in 2006. In other words, Plaintiff would apply 12 U.S.C. § 4908(d) to use the modified loan terms for a new "initial amortization schedule," but would not apply 12 U.S.C. § 4908(d) to use the Property value at modification.

As already discussed above, "Termination Date" (which is termed "Automatic Termination Date" herein) is defined in 12 U.S.C. § 4901(18) using other defined terms. *Supra*, at pg. 9. Specifically, the definition of termination date incorporates the term *initial amortization schedule*, which is defined in 12 U.S.C. § 4901(5) as the "schedule established at the time at which a residential mortgage transaction is consummated," and *original value*, which is the lesser of the sales price or the appraised value of the property "at the time . . . the subject

---

[1] If Green Tree were to use the value of $237,603 the prior servicer obtained at the time Plaintiff's loan was modified, the new Automatic Termination Date would be years later. Obviously, choosing to use the documented value of $322,700 instead does not prejudice Plaintiff.

13

residential mortgage transaction was consummated." Each definition relates to the value *as of the time the residential mortgage transaction is consummated*.

Section 4902(d) states that post-modification, the "cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan." In other words, instead of using values as of the time the residential mortgage transaction is consummated, the values should be as of the time the loan modification was completed.

But Plaintiff wants to pick and choose which post-modification values are used for purposes of calculating the post-modification Automatic Termination Date. Plaintiff would use the modified loan terms for the "initial amortization schedule" – even though the term "initial amortization schedule" used to define termination date specifies "at the time at which a residential mortgage transaction is consummated." But Plaintiff would use the Property's value at origination – even though this is the value at the time the residential mortgage transaction consummated and not at the time the loan modification was completed. Yet both are "modified terms and conditions" of the Loan Modification.

It is a fundamental canon of statutory construction that a statute should be read to give meaning to the entire statute and effectively harmonize its provisions. *Fowler v. U.S.*, 110 F.Supp.2d 477, 481 (N.D.W. Va. 2000). A statute should be read to give "internally consistent importance to each term in a statute," giving "the most internally consistent or harmonious meaning possible." *U.S. v. Passaro*, 577 F.3d 207, 213 (4th Cir. 2009) (first quote); *Resh v. Galley*, 962 F.2d 7, 1992 WL 107403, *2 (C.A.4 (MD.)).

Plaintiff's interpretation is not internally consistent. Clearly, by adding 12 U.S.C. § 4902(d) to the PMI termination provisions of HPA, Congress intended to make clear that the calculations for termination would be modified by the terms and conditions of the loan

14

modification, and they would not be those at the time the residential mortgage transaction was consummated. Yet Plaintiff chooses to ignore this intent and hold fast to the Property value at origination for purposes of calculating the termination date.

Not only is Plaintiff's interpretation of the statute internally inconsistent, it also yields an illogical, unreasonable result, that is inconsistent with the purpose of the statute. When interpreting a statute, one "must always be cognizant of the fundamental principle that statutory construction is approached from a commonsensical perspective and seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Beyond Systems, Inc. v. Kraft Foods, Inc.*, 972 F.Supp.2d 748, 763 (D. Md. 2013) (internal quotations and citations omitted).

Based on the loan terms and Property value at origination, Plaintiff's Automatic Termination Date was January 1, 2016. By modifying his loan Plaintiff argues that his Automatic Termination Date has been moved up 2 years, to January 1, 2014. Yet the value of his Property has declined.

The net effect of Plaintiff's position is that the PMI on his Loan would have terminated when the principal balance reached 95% (not 78%) of the Property's value.[2] This is higher than the LTV of Plaintiff's Loan at origination, which was 90%.[3] Plaintiff's interpretation is clearly inconsistent with the purpose for which PMI is made available, and it is inconsistent with the HPA which attempts to ensure that PMI will not cancel until the LTV has dropped below 80%, even after loan modification.

---

[2] On January 1, 2014, the principal balance in the amortization schedule attached as Exhibit B-2 is $309,177.82, which is 95.8% of $322,700.
[3] At origination, the principal balance was $355,500, which is 90% of $395,000, the value at origination.

15

## VI. CONCLUSION

Applying the provisions of the HPA to the uncontroverted facts, Plaintiff's Automatic Termination Date after Loan Modification is February 1, 2020. Plaintiff's interpretation of the applicable statutory provisions is inconsistent with the purpose of the HPA, and yields an inconsistent, unreasonable result that does not serve the purpose for which the HPA was intended.

The date on which Plaintiff's PMI will automatically terminate, assuming Plaintiff continues to make his loan payments timely, i.e., February 1, 2020, has not passed. Accordingly, Green Tree has not violated the HPA or the WVCCPA.

Wherefore, for the reasons discussed herein, defendant Green Tree Servicing, LLC requests this Court to grant it summary judgment on the Complaint filed by Curt Rice and to grant such other relief as the Court deems appropriate.

Respectfully submitted,

**GREEN TREE SERVICING, LLC**
**By: Spilman Thomas and Battle, PLLC**

 s/ *Debra Lee Hovatter*
Debra Lee Hovatter (WVSB # 9838)
Spilman Thomas & Battle, PLLC
48 Donley Street, Suite 800
Morgantown, WV 26507-0615
304.291.7951 / 304.291.7979 (*facsimile*)
dhovatter@spilmanlaw.com

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CURT RICE,

      **Plaintiff,**

v.                                                CIVIL ACTION NO. 3:14-CV-93 (Groh)

**GREEN TREE SERVICING, LLC,**

      **Defendant.**

## CERTIFICATE OF SERVICE

      I, Debra Lee Hovatter, counsel for defendant Green Tree Servicing LLC, do hereby certify that on April 30, 2015, I electronically filed the above **Green Tree Servicing, LLC's Memorandum of Law in Support of Its Motion for Summary Judgment**, and that the same has been served upon counsel of record via electronic notification through the Court's CM/ECF system, as follows:

      Andrew C. Skinner, Esq.
      Skinner Law Firm
      P.O. Box 487
      Charles Town, WV  25414
      AndrewSkinner@Skinnerfirm.com
      **Counsel for Plaintiff**


                                                            /s/ *Debra Lee Hovatter*
                                                            Debra Lee Hovatter (WV Bar No. 9838)