**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**CURT RICE,**

       Plaintiff,

**v.**                                **CIVIL ACTION NO.: 3:14-CV-93**
                                        **(GROH)**

**GREEN TREE SERVICING, LLC,**

       Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now before the Court are the parties' cross-motions for summary judgment. The parties' dispute concerns the calculation, under the Homeowners Protection Act of 1998 ("HPA"), 12 U.S.C. §§ 4901-4910, of the automatic termination date of the Plaintiff's obligation to make private mortgage insurance ("PMI") payments to the Defendant. The Plaintiff, Curt Rice, argues that the automatic termination date of his PMI requirement has passed and therefore that the Defendant, Green Tree Servicing, LLC, has been unlawfully billing the Plaintiff for PMI in violation of the HPA and the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W. Va. Code §§ 46A-1-101 to 46A-8-102. The Defendant counters that the automatic termination date has not passed, based upon a calculation that takes into consideration the value of the Plaintiff's property after he entered into a loan modification agreement. Additionally, the Defendant asserts that, even if it is deemed to have violated the HPA, the Defendant's conduct does not amount to a violation of the WVCCPA. For the following reasons, the Court **GRANTS IN PART** the Plaintiff's Motion

for Summary Judgment [ECF No. 22] as to Count One of the Plaintiff's Amended Complaint, concerning the HPA ("the HPA claim"), and **DENIES IN PART** the Plaintiff's Motion for Summary Judgment as to Count Two of the Plaintiff's Amended Complaint, concerning the WVCCPA ("the WVCCPA claim"). Consistent with that ruling, the Court **DENIES IN PART** and **GRANTS IN PART** the Defendant's Motion for Summary Judgment [ECF No. 23].

## I. Background

### A.    Procedural History

This civil action was initiated on January 21, 2014, when the Plaintiff, while acting *pro se*, filed a complaint against the Defendant in the Magistrate Court of Jefferson County, West Virginia. The Plaintiff alleged that the Defendant was billing and removing funds from the Plaintiff's escrow account for PMI payments after the automatic termination date for those payments had passed. Green Tree filed a motion to dismiss in the magistrate court, which was granted on June 23, 2014.

On July 7, 2014, the Plaintiff obtained counsel and filed a notice of appeal of the magistrate court's order. On July 22, 2014, he moved for leave to file an amended complaint in the Circuit Court of Jefferson County. The circuit court granted leave to file an amended complaint on July 24, 2014. The Plaintiff's amended complaint contained two counts. Count one alleged violations of the HPA. Count two alleged violations of the WVCCPA. The Defendant removed the case to this Court on August 18, 2014. On March 31, 2015, the Court denied the Plaintiff's motion to remand. The Defendant argued, and this Court finds, that the Court has original jurisdiction over the HPA claim pursuant to 28

U.S.C. § 1331 and supplemental jurisdiction over the WVCCPA claim pursuant to 28 U.S.C. § 1367(a). The parties filed their dispositive motions on April 30, 2015. The parties have filed response and reply briefs to each motion, and the issues are now ripe for this Court's review.

**B.    Factual History**[1]

On August 24, 2006, the Plaintiff obtained a $355,550 loan to finance the purchase of residential real property in Charles Town, West Virginia. The loan was secured by a Deed of Trust, which encumbers the Plaintiff's Charles Town property. On August 24, 2006—the date of "origination" of the Plaintiff's loan—the appraised value of the property was $452,000. The contract purchase price of the property was $395,000.

The terms of the Plaintiff's loan required him to purchase and maintain PMI, and the Plaintiff executed a "Private Mortgage Insurance Disclosure" on August 24, 2006. At that time, an amortization schedule for the payment of the loan was created. Under that amortization schedule—which utilized the original principal loan amount of $355,550, an interest rate of 6.75%, a thirty-year term, the $452,000 value of the Plaintiff's property at origination, and the assumption that the Plaintiff's loan payments were kept current—the date on which the Plaintiff's PMI would automatically terminate under the HPA, as provided for in 12 U.S.C. § 4902(b), was January 1, 2016.

The Federal National Mortgage Association ("Fannie Mae") acquired the Plaintiff's loan on October 16, 2006, and it remains the investor of the Plaintiff's loan. The Plaintiff's loan was serviced by Bank of America, N.A. (which also conducted business as

---

[1] Facts concerning the history of this civil action are drawn in part from the parties' joint "Stipulated Facts" document and from a review of the parties' pleadings and attached exhibits.

Countrywide Home Loans Servicing or BAC Home Loans Servicing), until June 1, 2013, at which time the servicing of the Plaintiff's loan was transferred to the Defendant. The Defendant has continued to service the Plaintiff's loan since that time.

In 2010, while his loan was still being serviced by Bank of America, N.A., the Plaintiff obtained a modification of his loan through the federal Home Affordable Modification Program ("HAMP"). HAMP, established as part of the "Emergency Economic Stabilization Act of 2008" in the wake of the financial and housing crisis, "provided an incentive for lenders to modify mortgages so that struggling homeowners could stay in their homes." Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 772 (4th Cir. 2013) (citing 12 U.S.C. §§ 5201-5261). Under HAMP, the Plaintiff signed a Home Affordable Modification Agreement (hereinafter referred to as the "Modification Agreement") on September 8, 2010. The Modification Agreement explicitly provided that it would "amend and supplement" the Plaintiff's mortgage or deed of trust on his property and the note secured by the mortgage. Pl.'s Mot. Summ. J. Ex. A-2, at 1.[2] Under the Modification Agreement, the new maturity date became September 1, 2036. Id. at 2. The new principal balance of the Plaintiff's note became $340,123.01. Id. The insurance rate of the Plaintiff's loan was adjusted to a "step-rate" plan. Id. at 3.

The parties have stipulated that, for purposes of determining the date the Plaintiff's PMI should automatically terminate subsequent to his loan modification, the applicable amortization schedule should run from the time of the modification, September 1, 2010. The parties further stipulated that the terms of the Plaintiff's loan as modified by the

---

[2] The Modification Agreement is also provided as Exhibit A-2 to the Defendant's Motion for Summary Judgment.

Modification Agreement should apply, meaning that the Plaintiff's loan accrues interest at a step-rate, that the maturity date is September 1, 2036, and that the applicable principal balance was $340,123.01.

As stated above, on June 1, 2013, servicing of the Plaintiff's loan was transferred to the Defendant. The Defendant avers that it determined, based on information the Plaintiff's prior loan servicer had provided to Fannie Mae, that the prior loan servicer had conducted a valuation of the Plaintiff's property in 2010, when the Plaintiff applied for his HAMP loan modification. According to the information the Defendant reviewed, the prior servicer found that the Plaintiff's property had a value of $237,603 in 2010. Little else concerning this 2010 valuation is known. The Defendant avers that it was unable to find certain documentation relating to the 2010 valuation, and that this missing documentation was required by the Fannie Mae Servicing Guidelines ("Servicing Guidelines"). The Defendant asserts that it has always serviced and will continue to service the Plaintiff's loan in accordance with the Servicing Guidelines. As the Defendant explains in its memorandum in support of its motion for summary judgment, when a servicer is tasked with determining whether a borrower can qualify for a HAMP loan modification, the servicer is required, under the Servicing Guidelines, to evaluate the borrower's mortgage loan using what is known as a Net Present Value ("NPV") test.[3] The NPV test requires the servicer to obtain a recent valuation of the property that secures the loan. The valuation cannot be more than ninety days old. Accordingly, in 2013, in order to complete the required

---

[3] In this Order, the Court uses the terms "mortgagor" and "borrower" interchangeably. "Mortgagor" is defined at 12 U.S.C. § 4901(11) as meaning "the original borrower under a residential mortgage or his or her successors or assignees."

documentation, the Defendant obtained another valuation of the Plaintiff's property. This valuation was obtained from a vendor using an "Automated Valuation Model"—a process permitted by the Servicing Guidelines—and it returned a value of $322,700.

In 2013, the Plaintiff contacted the Defendant and requested the automatic termination date for his PMI. In December of 2013, Green Tree prepared a new amortization schedule for the Plaintiff's loan, based upon the terms of the Modification Agreement. Using this schedule, together with the new valuation of the Plaintiff's property obtained in 2013, the Defendant determined that the Plaintiff's automatic termination date was February 1, 2020.[4] The Plaintiff disputes the Defendant's calculation of his automatic termination date. The Plaintiff argues that the automatic termination date should be calculated by using the "original value" of his property, as defined by the HPA, which the Plaintiff asserts should be the sales price of $395,000. Using this value in the calculation, the Plaintiff's position is that his PMI requirement should have automatically terminated on March 1, 2014.

## II. Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when there is no genuine issue as to any material fact and the moving party is entitled to

---

[4] A different amortization schedule was prepared in or around November 2013, but the Defendant avers that the November 2013 schedule should not be used to determine the automatic termination date, because it was not properly calculated. The Court finds that the amortization schedule created in December 2013 is the better of the two schedules that the parties propose utilizing in this case. Therefore, the Court will utilize that amortization schedule as the "amortization schedule then in effect." See 12 U.S.C. § 4901(6). The December 2013 schedule was filed as an attachment to the Plaintiff's motion for summary judgment as Exhibit C and as an attachment to the Defendant's motion for summary judgment as Exhibit B-2. Throughout his filings, the Plaintiff provides alternate dates for use in calculating damages, depending upon which amortization schedule is used. In this Order, the Court will refer only to the date offered by the Plaintiff that corresponds to the December 2013 schedule.

judgment in its favor as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict

for the non-moving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Thus, the Court must conduct "the threshold inquiry of determining whether there is the

need for a trial—whether, in other words, there are any genuine factual issues that properly

can be resolved only by a finder of fact because they may reasonably be resolved in favor

of either party."  <u>Id.</u> at 250.

The party opposing summary judgment "must do more than simply show that there

is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith</u>

<u>Radio Corp.</u>, 475 U.S. 574, 586 (1986).  That is, once the movant has met its burden to

show an absence of material fact, the party opposing summary judgment must then come

forward with affidavits or other evidence demonstrating there is indeed a genuine issue for

trial.  Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 323-35; <u>Anderson</u>, 477 U.S. at 248.  "If the

evidence is merely colorable, or is not significantly probative, summary judgment may be

granted."  <u>Anderson</u>, 477 U.S. at 249 (citations omitted).

### III.  Discussion

### A.    The Homeowners Protection Act Claim

As the parties frame the issue posed by their cross-motions for summary judgment,

the Court is now tasked with determining what the denominator of a fraction should be.

The HPA governs when and how private mortgage insurance can be cancelled or must be

terminated.  Pursuant to 12 U.S.C. § 4902(b)(1), a PMI requirement in connection with a

residential mortgage transaction shall automatically terminate "on the termination date if,

on that date, the mortgagor is current on the payments required by the terms of the

7

residential mortgage transaction." In this case, the parties agree that the Plaintiff is current on all payments, and therefore the requirement for PMI must terminate "on the termination date." Id. The definition of termination date under the HPA is provided at 12 U.S.C. § 4901(18).[5] That provision provides as follows:

The term "termination date" means—

(A) with respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

(B) with respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

12 U.S.C. § 4901(18). Accordingly, the basic formula for determining the automatic termination date of a PMI requirement requires utilizing the "principal balance of the mortgage" as the numerator of a fraction, with the "original value" of the property as the denominator. The date when a borrower's principal balance is first scheduled to be equal to or less than 78% of the original value is the termination date under the HPA.

The Plaintiff avers that his step-rate loan is an adjustable rate mortgage. The

---

[5] The HPA defines eighteen terms. See 12 U.S.C. § 4901(1)-(18). Seventeen of the eighteen definitions provide that each designated term "means" what is contained in the definition. (The exception is the term "servicer," defined at § 4901(16) as follows: "The term 'servicer' has the same meaning as in section 2605(i)(2) of this title, with respect to a residential mortgage.") That the HPA's definitions use the word "means" is not an insignificant detail, given the importance of the act's definitions to the instant dispute. See Helvering v. Morgan's, Inc., 293 U.S. 121, 125 n.1 (1934) (distinguishing "means" from "includes" and providing that "[t]he natural distinction would be that where 'means' is employed, the term and its definition are to be interchangeable equivalents, and that the verb 'includes' imports a general class, some of whose particular instances are those specified in the definition").

Defendant disputes this assertion, and therefore contests whether subsection (A) or subsection (B) is the appropriate definition to apply under § 4901(18). The parties have stipulated that the Plaintiff's loan became a step-rate loan under the Modification Agreement. As there are only two varieties of rates discussed in the HPA—fixed rate and adjustable rate—the Plaintiff's step-rate loan must qualify as one or the other. Section 4901(1) defines an adjustable rate mortgage, in part, as being "a residential mortgage that has an interest rate that is subject to change." Section 4901(3) defines a fixed rate mortgage as "a residential mortgage that has an interest rate that is not subject to change." The HPA does not provide its own definition of a step-rate loan or step-rate mortgage. Black's Law Dictionary defines "step-rate-premium insurance" as insurance "whose premiums increase at times specified in the policy." Insurance: Step-Rate-Premium Insurance, Black's Law Dictionary (10th ed. 2014). The parties' Modification Agreement provides that the Plaintiff's interest rate will be 3% for the first five years of the modified loan, 4% for the sixth year, and 4.375% for years seven through twenty-seven. This Court finds that, under the definitions provided in the HPA, the Plaintiff's step-rate loan is an adjustable rate mortgage, as it has an interest rate that is subject to change (even if the date of each change is predetermined). The applicable definition of "termination date" is therefore found in § 4901(18)(B).

The words "first scheduled" as used in § 4901(18) are important in understanding the calculation of an automatic termination date, as a separate provision, 12 U.S.C. § 4902(a), concerning "borrower cancellation," provides that a requirement for PMI shall terminate at the option of the borrower (or "mortgagor") on the "cancellation date" (separately defined at 12 U.S.C. § 4901(2)), or on any later date, provided that the

9

borrower fulfills certain enumerated requirements under that provision. <u>See</u> 12 U.S.C. § 4902(a). If a borrower meets the requirements for cancellation before his scheduled automatic termination date, he may seek a borrower cancellation under § 4902(a). The dispute in this case concerns calculation of an automatic termination date under § 4902(b), and thus concerns a set date that becomes apparent when calculated pursuant to the pertinent HPA provisions.

To determine that set date, one must address the denominator at issue: "the original value of the property securing the loan." <u>See</u> 12 U.S.C. § 4901(18). Section 4901(12) provides as follows:

> The term "original value", with respect to a residential mortgage transaction, means the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated. In the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction.

"Residential mortgage transaction" is also a defined term under the HPA. Section 4901(15) gives the following definition:

> The term "residential mortgage transaction" means a transaction consummated on or after the date that is 1 year after July 29, 1998, in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against a single-family dwelling that is the principal residence of the mortgagor to finance the acquisition, initial construction, or refinancing of that dwelling.

In 2006, on the date of origination of the Plaintiff's $355,550 loan, the appraised value of the Plaintiff's property was $452,000. The contract purchase price of the property was $395,000. Pursuant to § 4901(12), the "original value" of the property under the HPA was $395,000, the lesser of the two figures. Under the amortization schedule that was then

prepared, the date on which the Plaintiff's PMI would automatically terminate—meaning the date on which his principal balance on the mortgage was first scheduled to reach 78% of the original value, or $308,100—was January 1, 2016.  In 2010, several years after his automatic termination date was first calculated, the Plaintiff entered into the Modification Agreement under HAMP.  The Modification Agreement was signed by the Plaintiff and by a representative of Mortgage Electronic Registration Systems, Inc., as nominee for BAC Home Loans Servicing (also known as Bank of America, N.A.), the prior loan servicer before the Defendant.  Under the Servicing Guidelines, servicers are directed to use Form 3157, a standard form, during the loan modification process, and it appears that Form 3157 was used in this case.  It is undisputed that the Modification Agreement changed some terms of the Plaintiff's loan, including his principal balance.  Section 3, paragraph B of the Modification Agreement provides, "The new Principal balance of my Note will be $340,123.01."  Pl.'s Mot. Summ. J. Ex. A-2, at 2.  But the Modification Agreement does not explicitly address the value of the Plaintiff's property.  No reference is made to the original value as defined under § 4901(12), and there is no indication that a new valuation of the Plaintiff's property occurred or was scheduled to occur.

The HPA addresses the effect of loan modifications on the termination of PMI at 12 U.S.C. § 4902(d).  That provision provides, in full: "If a mortgagor and mortgagee (or holder of the mortgage) agree to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction, the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan."  Therein lies the real heart of the parties' dispute.  In order to determine the automatic termination date under § 4902(b), one must determine the "termination date" as defined in § 4901(18).  In

determining the proper termination date under § 4901(18), one must know when the principal balance of a mortgage was first scheduled to reach 78% of the "original value" as defined in § 4901(12).  But under § 4902(d), if a mortgagor agrees to a modification of the terms or conditions of a loan, then the termination date shall be recalculated to reflect the modified terms and conditions of the loan.  The issue presented becomes whether, under the HPA, a change in the value of a mortgagor's property is *always* a term or condition of a loan modification agreement.

The Plaintiff argues that the value of his property—which decreased significantly from 2006 to 2010—was not a "term or condition" of his 2010 loan modification under § 4902(d).  He further argues that, even if a change in the original value of his property was a term or condition of his modification, he did not *agree* to any such term or condition.  The Plaintiff avers that the original sales price of his property remains the "original value" under the HPA, and that this interpretation of the HPA is supported by the plain language of the statute and by the terms of the Modification Agreement.  The Defendant counters that common sense dictates the terms and conditions of a loan modification will always include a valuation of the property at issue.  Accordingly, the Defendant argues that a calculation of the Plaintiff's automatic termination date that takes the decreased property value into account is appropriate under the HPA, and would operate in harmony with the directives of the Treasury Department, with HAMP policy interests and with the Fannie Mae Servicing Guidelines.

The plain language of the HPA supports the Plaintiff's position.  Courts "must enforce plain and unambiguous statutory language according to its terms."  <u>Hardt v. Reliance Standard Life Ins. Co.</u>, 560 U.S. 242, 251 (2010).  The Fourth Circuit follows the

"plain meaning rule" of statutory interpretation, meaning that, "unless there is some ambiguity in the language of a statute, a court's analysis must end with the statute's plain language." <u>Hillman v. I.R.S.</u>, 263 F.3d 338, 342 (4th Cir. 2001) (citing <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917)). When determining whether the language of a statute is plain, a court "must read the words 'in their context and with a view to their place in the overall statutory scheme.'" <u>King v. Burwell</u>, — U.S. —, 135 S. Ct. 2480, 2489 (2015) (quoting <u>Food & Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 133 (2000)).

The definition of original value provided in the HPA at § 4901(12) is straightforward. Looking to the first of the definition's two sentences, the original value means "the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated." 12 U.S.C. § 4901(12). The parties do not dispute that their Modification Agreement was not a "residential mortgage transaction" under the HPA. Therefore, under this first sentence of § 4901(12), the original value of the Plaintiff's property was the $395,000 sales price.

The second sentence of § 4901(12) provides that "[i]n the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction." As stated, the parties do not dispute that the Modification Agreement was not a residential mortgage transaction. But even if it were, the Modification Agreement was not a "refinancing." One other court has considered the distinction between a modification, a residential mortgage transaction and a refinancing, as those terms operate under the HPA,

and that court reached the same conclusion. See Rodriguez v. Chase Home Fin., LLC, No. 10 C 05876, 2011 WL 4435633, at *2 (N.D. Ill. Sept. 23, 2011) ("[T]he HPA does not treat every transaction that could be called a modification as the equivalent of a 'residential mortgage transaction' (or more precisely relevant here, a refinancing).").

Accordingly, reading § 4901(12) in isolation, the original value of the Plaintiff's property subsequent to the parties' Modification Agreement remained $395,000. But the Court must construe the HPA as a whole, and not merely its isolated provisions. See King, 135 S. Ct. at 2489 (citing Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 290 (2010)). Looking to the other pertinent provisions of the HPA, 12 U.S.C. § 4901(18)(B) provides that the principal balance of the Plaintiff's mortgage, for purposes of calculating the Plaintiff's termination date, must be based "solely on the amortization schedule then in effect." Section 4901(6) defines "amortization schedule then in effect" as follows:

> The term "amortization schedule then in effect" means, with respect to an adjustable rate mortgage, a schedule established at the time at which the residential mortgage transaction is consummated or, if such schedule has been changed or recalculated, is the most recent schedule under the terms of the note or mortgage, which shows—
>
> > (A) the amount of principal and interest that is due at regular intervals to retire the principal balance and accrued interest over the remaining amortization period of the loan; and
> >
> > (B) the unpaid balance of the loan after each such scheduled payment is made.

In this case, the amortization schedule prepared by the Defendant in December 2013 is the best available schedule under the circumstances, and therefore must serve as the "most recent schedule under the terms of the note or mortgage" pursuant to § 4901(6). The

December 2013 schedule meets the requirements of § 4901(6) in that it shows the amount of principal and interest due, together with the unpaid principal balance after each scheduled payment.

Before addressing loan modifications under § 4902(d), the Court is drawn to the language of § 4902(a), an otherwise inapplicable provision. Under that section, which provides for borrower cancellation—as distinguished from automatic termination—a PMI requirement can be canceled when a mortgagor makes a cancellation request on the "cancellation date" or any later date.[6] Upon the mortgagor's request, cancellation is mandatory if the mortgagor—

(1) submits a request in writing to the servicer that cancellation be initiated;

---

[6] Cancellation date is defined at § 4901(2) as follows:

The term "cancellation date" means—

(A) with respect to a fixed rate mortgage, at the option of the mortgagor, the date on which the principal balance of the mortgage—

(i) based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 80 percent of the original value of the property securing the loan; or

(ii) based solely on actual payments, reaches 80 percent of the original value of the property securing the loan; and

(B) with respect to an adjustable rate mortgage, at the option of the mortgagor, the date on which the principal balance of the mortgage—

(i) based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 80 percent of the original value of the property securing the loan; or

(ii) based solely on actual payments, first reaches 80 percent of the original value of the property securing the loan.

12 U.S.C. § 4901(2).

(2) has a good payment history with respect to the residential mortgage;

(3) is current on the payments required by the terms of the residential mortgage transaction; and

(4) *has satisfied any requirement of the holder of the mortgage* (as of the date of a request under paragraph (1)) *for*—

(A) *evidence* (of a type established in advance and made known to the mortgagor by the servicer promptly upon receipt of a request under paragraph (1)) *that the value of the property securing the mortgage has not declined below the original value of the property*; and

(B) certification that the equity of the mortgagor in the residence securing the mortgage is unencumbered by a subordinate lien.

12 U.S.C. § 4902(a) (emphases added).  Accordingly, in order for a PMI requirement to be cancelled under § 4902(a), a mortgagor must satisfy any request from the holder of the mortgage for evidence that the value of the mortgagor's property has not declined below the original value.  Thus, § 4902(a) explicitly provides the mortgagee with a safeguard in the event of property value depreciation.  Section 4902(b) contains no such language. Proponents of the Defendant's interpretation of the HPA might argue that there is a built-in safeguard under § 4902(d), because the holder of a mortgage would expect the "original value" of a mortgagor's property to be replaced with the current value at the time of any modification.  Under that theory, because a mortgagor's PMI termination date would automatically be extended by a modification that included a lower property value, there is no need to specifically address modified loans with declining values in § 4902(b). Nonetheless, the absence of similar language from § 4902(b) is noted.

As for the text of § 4902(d), the Court will again analyze the language in two parts. Section 4902(d) begins: "If a mortgagor and mortgagee (or holder of the mortgage) agree

16

to a modification of the terms or conditions of a loan pursuant to a residential mortgage transaction . . . ." As an initial matter, the phrase "pursuant to a residential mortgage transaction" is construed as modifying only the word "loan," and as having no effect on the word "modification." See Rodriguez, 2011 WL 4435633, at *3 ("The clause applies only to the immediately preceding noun—'loan'—thus making clear that only modifications of a loan that was made 'pursuant to a residential mortgage transaction' [are] covered by the recalculation requirement."). This reading is in line with the "rule of the last antecedent." See Barnhart v. Thomas, 540 U.S. 20, 26 (2003) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."). While the rule of the last antecedent "is not an absolute and can assuredly be overcome by other indicia of meaning," id., the Court's interpretation in the instant case is consistent with the HPA's use of "residential mortgage transaction," "refinancing" and "modification" as distinct terms. Therefore, as the Plaintiff's loan was obtained pursuant to a residential mortgage transaction, a modification of the terms and conditions of his loan is subject to § 4902(d), while the modification itself was not a residential mortgage transaction or a refinancing.

In addition to their dispute concerning the "terms or conditions" of the Modification Agreement, the parties disagree as to what meaning to assign to the word "agree," as that word is used in § 4902(d). The Plaintiff stresses that even if a modification of the original value of his property is construed to be a term or condition of the Modification Agreement, he never *agreed* to the modification of that term or condition. The Defendant gives this aspect of the parties' dispute short shrift, no doubt because the Defendant views this argument as being subsumed into its position that the current value of a piece of property is always a condition of a mortgage loan modification. As the Defendant would have it, if

17

a mortgagor agrees to a modification of a loan, the mortgagor has thus agreed to a modification of the terms and conditions of that loan, including those terms and conditions that are not recited in the parties' agreement but that a mortgagee or servicer deems incorporated as a matter of "common sense." This argument tracks with the Defendant's general position, as it asks the Court to give a casual reading to what is in fact very specific language. In interpreting statutory text, the Court is "obliged to give effect, if possible, to every word Congress used." See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) (citing United States v. Menasche, 348 U.S. 528, 538-39 (1955)); see also Kungys v. United States, 485 U.S. 759, 778 (1988) (plurality opinion) (discussing the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant."); Campbell v. Hampton Roads Bankshares, Inc., 925 F. Supp. 2d 800, 808 (E.D. Va. 2013) ("[T]he Court must give meaning to every word of the statute, not reading any word out or treating it as surplusage.") (citing United States v. Pressley, 359 F.3d 347, 350 (4th Cir. 2004)). Here, the Defendant asks the Court to either ignore the word "agree," or to apply that word to only "a modification of . . . a loan," instead of to "a modification of the terms or conditions of a loan," as written. Such an interpretation, if "agree" is given its ordinary meaning, renders the words "terms or conditions" entirely superfluous. To further illustrate the flaws of the Defendant's interpretation, the Court notes that the "original value" of the Plaintiff's property was not only changed unilaterally by the Defendant, it was changed three years after the Plaintiff agreed to modify his loan. Even if recognition of the decreased value of the Plaintiff's property was a condition of the Modification Agreement under § 4902(d), the Plaintiff did not agree to modify that condition. Indeed he *could not* have agreed to modify the value of his property to what the Defendant now proposes.

18

The text of § 4902(d) concludes: "the cancellation date, termination date, or final termination shall be recalculated to reflect the modified terms and conditions of such loan." Accordingly, if the Plaintiff agreed to a modification of the terms or conditions of his loan, then the termination date must be recalculated to reflect those modified terms and conditions.

To reach the crux of the Defendant's position, the Court must assume, for the sake of argument, that the word "agree" is used in the very general sense that the Defendant proposes above. But even then, the Defendant's position cannot survive another flaw—a review of the Modification Agreement makes clear that a change in the value of the Plaintiff's property was not a term or condition of their modified agreement. The Modification Agreement provides that it serves to "amend and supplement (1) the Mortgage or Deed of Trust on the Property, and (2) the Note secured by the Mortgage." Pl.'s Mot. Summ. J. Ex. A-2, at 1. The mortgage and the note together are referred to in the Modification Agreement as the "Loan Documents." Id. Section 3 of the Modification Agreement is titled "The Modification." Id. at 2. That section provides that the loan's "new Maturity Date will be: September 1, 2036," and that "The new Principal balance of [the Plaintiff's] Note will be $340,123.01." Id. Section 3 also contains a table demonstrating the payment schedule for the modified loan, incorporating the step-rate structure. Id. at 3. Mortgage insurance is referenced in two different places in the Modification Agreement. Pursuant to Section 4, paragraph D, the Plaintiff agreed to "pay to Lender . . . a sum . . . to provide for payment of amounts due for: . . . (d) mortgage Insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents." Id. at 4. Section 4, paragraph O provides, in full,

"I understand that the mortgage Insurance premiums on my loan may increase as a result of the capitalization which will result in a higher monthly payment. Furthermore, the date on which I may request cancellation of mortgage Insurance may change as a result of the higher unpaid principal balance." Id. at 6. At Section 4, paragraph F, the Modification Agreement provides that "all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect." Id. at 5. That paragraph further states that, "except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents." Id. The value of the Plaintiff's property is not addressed anywhere in the Modification Agreement. There is no indication that the Plaintiff agreed to modify the statutorily-defined "original value" of his property for purposes of adjusting the automatic termination date of his PMI requirement. The Modification Agreement *does* acknowledge that the PMI cancellation date might change, but it speaks in terms of a potential "higher unpaid principal balance," not a potential lower "original value" of the property.

According to the Defendant, "It is common knowledge that several underwriting conditions must be met to obtain approval for a mortgage loan—and a loan modification, e.g., borrower's income, unencumbered title to the property that will serve as collateral, borrower's assets, credit score, and property value." It is the Defendant's position that each of these underwriting conditions, considered as of the time the loan decision is made, become conditions of a loan modification when interpreting § 4902(d). Instead of arguing that the decreased value of the Plaintiff's property was an implied or constructive condition of the Modification Agreement, the Defendant describes the condition as not "hidden." In

20

its reply to the Plaintiff's response to the Defendant's motion for summary judgment, the Defendant avers that property value "is not a *hidden* condition of the loan modification process," and that "[m]any conditions are not recited in the final loan documents—income, assets, credit score, etc. This does not make them *hidden* conditions." These averments aside, there is a paucity of evidence and discussion on this front, which can likely be blamed on the fact that the Defendant was not the Plaintiff's loan servicer at the time of the 2010 Modification Agreement. The only evidence in the record that is at all instructive is an email exchange between the Plaintiff and counsel for the Defendant, attached as an exhibit to the Defendant's reply. In an email sent on February 17, 2014, the Plaintiff wrote that "Bank of America did a valuation on my home in 2010. They declined to use that valuation in the modification, I had no bearing on that decision." Def.'s Reply Ex. A, at 1. As discussed above, the Defendant now seeks to use the results of a different valuation, conducted in 2013, in calculating the automatic termination date of the Plaintiff's PMI requirement.

The Defendant proposes an interpretation of § 4902(d) that the Court cannot adopt. In its response to the Plaintiff's motion for summary judgment, the Defendant argues that § 4902(d) "does not say that one is to take into consideration the 'terms and conditions' of the loan modification that appear in the loan modification document or that affect the obligations of the borrower. It says one must take into consideration the 'terms and conditions' of the modified loan." That is simply not the case. Instead, § 4902(d) states that when parties agree to a modification of the terms and conditions of a loan, the termination date must be recalculated "to reflect *the modified terms and conditions of such loan*." 12 U.S.C. § 4902(d) (emphasis added). The plain language of the HPA is

21

unambiguous, and it requires this Court to find in the Plaintiff's favor.

To support its reading of the statute, the Defendant relies heavily on the Fannie Mae Servicing Guidelines.  In a section on the termination of conventional mortgage insurance, the Servicing Guidelines provide that "mortgage insurance termination eligibility criteria must be based on the terms and conditions of the modified mortgage loan."   Def.'s Mot. Summ. J. Ex. B-1, at 34.  The Servicing Guidelines go on to state that a servicer must "use the amortization schedule of the modified mortgage loan and the property value at the time of the mortgage loan modification." Id.  Of course, guidelines issued by Fannie Mae for use by mortgage loan servicers carry little weight when they conflict with the plain language of a federal statute.   The HPA provides that its provisions "shall supersede any conflicting provision contained in any agreement relating to the servicing of a residential mortgage loan entered into by the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, or any private investor or note holder (or any successors thereto)." 12 U.S.C. § 4908(b).  Recently, a bulletin issued by the Consumer Financial Protection Bureau ("CFPB") specifically referenced the internal PMI cancellation guidelines utilized by "Government-Sponsored Enterprises" such as Fannie Mae.  See Consumer Fin. Prot. Bureau, CFPB Bulletin 2015-03, Compliance Bulletin: Private Mortgage Insurance Cancellation and Termination at *5 (August 4, 2015) available at http://www.consumerfinance.gov/guidance.   The CFPB bulletin explicitly cautioned servicers to "remember that investor guidelines cannot restrict the PMI cancellation and termination rights that the HPA provides to borrowers." Id.  In discussing discrepancies between the requirements of the HPA and certain investor guidelines concerning a mortgagor's cancellation date when property value has declined, the CFPB bulletin stated

that, under the HPA, "the borrower's PMI termination right would be unaffected by the property's decline in value." Id. at *5 n.18.

In addition, both parties attempt to muster the legislative history of the HPA in support of their respective arguments. While this Court finds a review of the plain language of the HPA sufficient to rule in the Plaintiff's favor, the Court notes that, were it to consider the legislative history and underlying policy of the HPA, the policy arguments would still support the Plaintiff's position. The HPA was enacted to "establish Federal guidelines for disclosure and termination of private mortgage insurance." H.R. Rep. No. 105-55, at 4 (1997). The need for legislation was found to exist "because homeowners are not always informed when PMI is required, and if it is, how it can be terminated." Id. at 6.

The Defendant argues that the congressional intent behind the 2000 amendment which added subsection (d), concerning loan modifications, to § 4902 should weigh heavily in its favor. Speaking in support of the American Homeownership and Economic Opportunity Act of 2000 ("AHEOA"), which included technical corrections and clarifications to the HPA, Representative Margaret Roukema said, "this bill will clarify the cancellation and termination issues to ensure that homeowners will be able to cancel private mortgage insurance." 146 Cong. Rec. H11960, H11992 (daily ed. Dec. 5, 2000) (statement of Rep. Roukema). Several months earlier, multiple representatives spoke in favor of the Private Mortgage Insurance Technical Corrections and Clarifications Act, which was later incorporated into AHEOA and which included amendments to § 4902 and to the definition of original value under § 4901(12). Representative John LaFalce stated that "this bill clarifies that for loans for the purpose of refinancing when establishing [loan-to-value] ratios, the value will be determined at the time of the refinance, not at the original time of

23

home purchase.  This avoids unfairly penalizing the borrower when the home has risen in value."  146 Cong. Rec. H3578, H3580 (daily ed. May 23, 2000) (statement of Rep. LaFalce).  Representative LaFalce continued, "Most notably, our bill clarifies that in the case of adjustable rate mortgages, balloon mortgages, or loan modifications, [loan-to-value] calculations are made based on the most recent amortization schedule, not based on an outdated schedule."  146 Cong. Rec., at H3580 (statement of Rep. LaFalce).  These statements are consistent with the plain language of the provisions of the HPA discussed above.

As to loan modifications of the type entered into by the parties in this case, the congressional record does not evince the intent that the Defendant ascribes to it.  The overriding policy considerations behind the HPA were disclosure and clarity.  Congress believed that new federal standards for termination of PMI were necessary "so that borrowers do not pay for insurance after all parties in the mortgage process agree that such insurance is no longer necessary."  H.R. Rep. No. 105-55, at 6 (1997).  As amended, the HPA was intended to "help maintain and provide the stability, provide the predictability, and provide the cheaper mortgage insurance and these important tools which are making it possible to obtain the dream of homeownership in this country."  146 Cong. Rec., at H3580 (statement of Rep. Vento).

Of the two theories now presented to the Court, only the Plaintiff's theory provides stability and predictability.  The Plaintiff's theory relies on the plain language of the HPA—its definitions of key terms, its formula for automatic termination and its provision concerning loan modifications—together with the terms and conditions that the parties agreed to in the Modification Agreement.  Under this approach, any homeowner in

possession of his loan documents and with access to Title 12 of the United States Code could determine the termination date of his PMI requirement. This interpretation gives effect to the HPA's undergirding principles of disclosure and clarity. The Defendant's theory leaves homeowners in the Plaintiff's position at a loss. Under the Defendant's interpretation, when a mortgagor agrees to a loan modification, the words "original value" are instantaneously given a new meaning, entirely divorced from the text of the HPA and applied regardless of the actual terms and conditions of any agreement.

For the foregoing reasons, the Court finds that the original value of the Plaintiff's property, as defined at 12 U.S.C. § 4901(12), remains $395,000. In consideration of the parties' Modification Agreement and under the appropriate amortization schedule, the date on which the principal balance of the Plaintiff's mortgage was first scheduled to reach 78% was March 1, 2014. Therefore, the Plaintiff's motion for summary judgment is **GRANTED IN PART** and the Defendant's motion for summary judgment is **DENIED IN PART** as to the HPA claim.

### B.    The West Virginia Consumer Credit and Protection Act Claim

The Plaintiff argues that the Defendant has violated the WVCCPA once a month, beginning on April 1, 2014, when the Defendant sent the Plaintiff a monthly billing statement which included a PMI premium as money that was due on the Plaintiff's loan, and continuing every month thereafter. The Defendant counters that it was required by law to send billing statements to the Plaintiff each month and that it should not be penalized for including PMI premiums on the Plaintiff's billing statements, as those premiums were the result of a good faith difference of legal opinion as to how to comply with the HPA and other federal directives.

The Plaintiff's WVCCPA claim is brought pursuant to section 46A-5-101, which provides consumers with a private cause of action against creditors or debt collectors who have violated the provisions of the WVCCPA. See W. Va. Code § 46A-5-101(1). Under section 46A-2-127 of the WVCCPA, "[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers." W. Va. Code § 46A-2-127. That section provides a non-exclusive list of examples of conduct that violates the WVCCPA. See W. Va. Code § 46A-2-127(a) to (h). One such example is "[a]ny false representation or implication of the character, extent or amount of a claim against a consumer, or of its status in any legal proceeding." W. Va. Code § 46A-2-127(d). The WVCCPA separately defines the terms "consumer," "claim," "debt collection" and "debt collector."[7] Courts in West Virginia have held that each violation of the WVCCPA can create a single cause of action for recovery. See, e.g., McGraw v. Discover Fin. Servs., Inc., No. CIV.A.2:05 0215, 2005 WL 1785259, at *4 (S.D.W. Va. July 26, 2005) (citing Strum v. Providian Nat'l Bank, 242 B.R. 599, 603

---

[7] Section 46A-2-122 provides the following definitions for the following terms, as those terms are used in sections 46A-2-122 to 46A-2-129a:

(a) "Consumer" means any natural person obligated or allegedly obligated to pay any debt.

(b) "Claim" means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or service which is the subject of the transaction is primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment.

(c) "Debt collection" means any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer.

(d) "Debt collector" means any person or organization engaging directly or indirectly in debt collection. The term includes any person or organization who sells or offers to sell forms which are, or are represented to be, a collection system, device or scheme, and are intended or calculated to be used to collect claims.

W. Va. Code § 46A-2-122.

26

(S.D.W. Va. 1999)).  In a decision addressing the plain language of section 46A-2-122, the West Virginia Supreme Court of Appeals held that a creditor collecting its own debt is still a "debt collector" under the WVCCPA.  Thomas v. Firestone Tire & Rubber Co., 266 S.E.2d 905, 909 (W. Va. 1980).  In a more recent decision, a district court in the Southern District of West Virginia, while not reaching the issue directly, stated that the "the language of the WVCCPA appears to raise some question as to its applicability to non-creditors," such as loan servicers.  Delebreau v. Bayview Loan Servicing, LLC, 770 F. Supp. 2d 813, 819 n.4 (S.D.W. Va. 2011), aff'd, 680 F.3d 412 (4th Cir. 2012).

In the instant case, the Defendant avers, and the Plaintiff does not deny, that the Plaintiff has timely paid every monthly installment due and owing under his modified loan since September of 2010.  Because the Plaintiff has timely paid his bills, his account has never been referred to the Defendant's collection department.  The Defendant has not made any collection calls or sent any collection letters to the Plaintiff.  In Thomas, the Supreme Court of Appeals of West Virginia held, pursuant to the plain language of section 46A-2-122, that the provisions of article 2 of that chapter, including section 46A-2-127, "must be applied alike to all who engage in debt collection, be they professional debt collectors or creditors collecting their own debts."  Thomas, 266 S.E.2d at 909.  The Supreme Court of Appeals reached that conclusion "[i]n light of the broad remedial purposes of [the WVCCPA]," as the WVCCPA was "designed to protect consumers against unscrupulous collection practices, by whomever perpetrated."  Id.  In this case, the Defendant's conduct does not rise to the level of "unscrupulous collection practices" and, arguably, did not constitute collection practices at all.  Outside of the monthly billing statements, the Defendant never contacted the Plaintiff concerning an outstanding debt or claim.

Regardless of the Defendant's status as a debt collector or creditor, this Court holds that each monthly billing statement sent by the Defendant to the Plaintiff did not amount to a "false representation," as that term is used in section 46A-2-227(d). The Defendant provided monthly billing statements to the Plaintiff in an effort to comply with federal and state law. On those monthly billing statements, the current amount due was itemized. Pl.'s Mot. Summ. J. Ex. E, at 1. In an annual escrow account disclosure statement provided to the Plaintiff, his PMI payments were indicated as part of his "payments from escrow." Pl.'s Mot. Summ. J. Ex. F. at 1. A monthly charge of $188.10 in PMI payments was included in the Plaintiff's monthly bill. The inclusion of this monthly charge was based upon the Defendant's interpretation of the requirements of the HPA. The dispute that subsequently arose concerning the proper interpretation of the applicable provisions of the HPA was presented to this Court as a matter of first impression. As discussed in detail above, the Court finds that the Defendant's interpretation of federal law was incorrect. But the Defendant's conduct was not fraudulent, deceptive or misleading, as required for this Court to find a violation of West Virginia law. And even if the Defendant's monthly billing statements could be construed as misleading or false representations of the amount of a claim owed, it would stretch too far the language and the purpose of the WVCCPA to hold that the Defendant misled the Plaintiff while engaging in debt collection. Therefore, the Plaintiff's motion for summary judgment is **DENIED IN PART** and the Defendant's motion for summary judgment is **GRANTED IN PART** as to the Plaintiff's WVCCPA claim.

## VI. Conclusion

Accordingly, for the aforementioned reasons, the Court **ORDERS** that the Plaintiff's Motion for Summary Judgment [ECF No. 22] is **GRANTED IN PART** as to the HPA claim

28

and **DENIED IN PART** as to the WVCCPA claim.  The Court further **ORDERS** that the Defendant's Motion for Summary Judgment [ECF No. 23] is **DENIED IN PART** as to the HPA claim and **GRANTED IN PART** as to the WVCCPA claim.

Pursuant to 12 U.S.C. § 4907(a)(1), the Court **ORDERS** that the Defendant pay to the Plaintiff actual damages in the amount of what the Plaintiff overpaid in private mortgage insurance each month since April 1, 2014, at $188.10 per month—totaling $3,385.80 as of the date of this Order—plus interest.  Under § 4907(a)(1), the rate for interest on actual damages is to be determined by the Court.  Interest will be calculated at 3% (three percent), consistent with the interest rate on the Plaintiff's modified loan at the time the majority of the violations occurred.  Additionally, pursuant to 12 U.S.C. § 4907(a)(2)(A), the Court **ORDERS** that the Defendant pay to the Plaintiff statutory damages in the amount of $2,000.00.  The Court further **ORDERS** that the Defendant pay to the Plaintiff his reasonable costs of the action and attorney's fees.  12 U.S.C. § 4907(a)(3), (4).

Any motion for an award of reasonable attorney's fees must be filed within thirty (30) days from the date of this Order.  Any response shall be filed within fourteen (14) days of the filing of the motion, with a reply brief due within seven (7) days of the filing of the response.  Any bill of costs shall be prepared and submitted within thirty (30) days, in accordance with Local Rule of Civil Procedure 54.01.  The Defendant may then file objections pursuant to that rule.  A hearing will be scheduled if necessary.  All other deadlines, hearings and trial dates in this matter are hereby **VACATED**.

The Clerk is **DIRECTED**, pursuant to Federal Rule of Civil Procedure 58, to enter a separate judgment order consistent with this Court's ruling.

The Clerk is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED**: September 15, 2015

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE